# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| WHEELING & LAKE ERIE RAILWAY COMPANY, | )<br>)<br>) Civil Action No. _____ |
| Plaintiff, | )<br>) |
| v. | )<br>) |
| DEFENSE NATIONAL STOCKPILE CENTER, | )<br>) Electronically Filed<br>) |
| Defendant. | ) |

## COMPLAINT

Plaintiff, Wheeling & Lake Erie Railway Company ("Wheeling") files this Complaint against Defendant, Defense National Stockpile Center ("DNSC"), stating as follows:

## NATURE OF THE ACTION

1. In October 1956, predecessors-in-interest of Wheeling and DNSC entered into a real estate lease and, pursuant to that lease, DNSC stockpiled thousands of tons of materials on the leased property, as ingredients for steelmaking operations in case of an emergency that would prevent access to those materials during the Cold War. Wheeling and DNSC entered into a second real estate lease for the same purposes in January 1996 (the "1996 Lease," a true and correct copy of which is attached hereto as Exhibit A). After years of removing stockpiled materials, in 2016, DNSC terminated the 1996 Lease. In the process of removing the stockpiled materials, however, DNSC destroyed the property by removing not only the stored materials, but also underlying soil, creating depressions on the property that have filled with water and resulted in three large ponds. The 1996 Lease imposes obligations upon DNSC to restore the property to an unimpaired condition upon termination, but DNSC did not and continues to refuse to do so.

By this Complaint, Wheeling seeks specific performance or, in the alternative, the costs of restoration as damages for DNSC's breach of the parties' lease.

**PARTIES**

2. Wheeling is a Delaware corporation with its principal place of business at 100 East First Street, Brewster, Ohio 44613.

3. DNSC is a part of the Defense Logistics Agency, a federal government agency in the United States Department of Defense. DNSC's principal place of business is located at 8725 John J. Klingman Road, Suite 3339, Ft. Belvoir, Virginia 22060-6223.

**JURISDICTION AND VENUE**

4. DNSC waived its sovereign immunity and consented to suit when it agreed to and executed the 1996 Lease, a real estate lease with Wheeling dated January 1, 1996. *See* Exhibit A.

5. DNSC expressly agreed in Paragraph 31.2 of the 1996 Lease to subject itself to the laws of Pennsylvania, as that Paragraph states that "[t]his Agreement shall be governed by the laws of the Commonwealth of Pennsylvania." Exhibit A ¶ 31.2.

6. Such language expresses contemplation of and consent to litigation resulting from a dispute arising out of that real estate lease.

7. This Court has personal jurisdiction over DNSC pursuant to 42 Pa. Cons. Stat. § 5322. DNSC has contacts with the Commonwealth of Pennsylvania sufficient to satisfy constitutional due process requirements.

# FACTS

**The 1956 Lease**

8. The Pittsburgh & West Virginia Railway Company ("P&WV") was incorporated in 1917 and would eventually own and operate a 112-mile portion of main line railroad extending from Pittsburgh Junction, Ohio to Connellsville, Pennsylvania, and approximately 20 miles of branch rail lines (the "Rail Line").

9. One of the branches of the Rail Line is known as the Clairton Branch, which runs from Pierce, Pennsylvania to Clairton, Pennsylvania (the "Clairton Branch").

10. Wheeling is the successor-in-interest to P&WV and, as the successor-in-interest, Wheeling has all right, title and interest in the Rail Line, including certain real estate located in the Borough of Jefferson Hills, Pennsylvania (which was formally known as Jefferson Borough).

11. As P&WV's successor-in-interest, Wheeling became the lessor of a real estate lease dated October 1, 1956 between P&WV and the United States of America (the "1956 Lease") for property located in the Borough of Jefferson Hills.

12. The property subject to the 1956 Lease is composed of three parcels of land totaling approximately 76.76 acres adjacent to the Clairton Branch that, in the area, runs next to a tributary of the Monongahela River called Peters Creek. The leased property is situated on both the north and south sides of the Clairton Branch (the "Property").

13. The Property was in close proximity to steel mills in the Monongahela River valley.

14. The United States of America entered into the 1956 Lease with P&WV for purposes of using the Property to store ores owned by the federal government as part of the Strategic Defense Stockpile, including manganese ore, ferromanganese, and fluorspar. The United States of America apparently stored such supplies for the steelmaking process to be

utilized in case of a national emergency during the Cold War. The United States of America also apparently stored such supplies to reduce dependence on foreign suppliers of these ores in such situations.

15. Prior to the entry of the 1956 Lease, the Property was used as a homestead, and apparently an orchard existed on a large portion of the Property. The surface of the Property was essentially flat farmland. A true and correct copy of an aerial photograph dated September 1938 depicting the Property, the Rail Line, Peters Creek, and adjacent lands is attached hereto as Exhibit B.

16. Upon commencement of the 1956 Lease, the federal government transferred thousands of tons of ores to the Property. For decades, the federal government stored such materials in piles directly on the ground surface of the Property, without cover and subject to weathering. A true and correct copy of an aerial photograph dated May 1967 depicting the Property, the piles of ores, the Rail Line, Peters Creek, and adjacent lands is attached hereto as Exhibit C.

17. Although the 1956 Lease provided the federal government with the option to renew the lease on multiple occasions, it also provided that no renewal shall extend beyond September 30, 1996.

**The 1996 Lease**

18. Knowing that any renewal of the 1956 Lease was set to expire by the express terms no later than September 30, 1996, the parties sought to enter into a new lease shortly before the expiration date.

19. On January 1, 1996, Wheeling and DNSC entered into a new lease for the Property, the 1996 Lease, for an initial term of two years and renewable thereafter on a year to year basis. *See* Exhibit A.

20. Paragraph 7.1 of the 1996 Lease, which is under a section of the 1996 Lease labeled "Maintenance and Repairs," provides that DNSC shall not create any nuisance and maintain the premises in a neat and clean condition:

> LESSEE will not create or permit any nuisance in, on or about the premises, and LESSEE shall maintain the premises in a neat and clean condition. Buildings and other structures of LESSEE shall be erected and/or maintained on the premises by LESSEE to the satisfaction of LESSOR.

Exhibit A ¶ 7.1.

21. Under that same section, Paragraph 7.2 provides that DNSC will not make alterations to the premises without Wheeling's written consent:

> LESSEE will not make, or permit to be made, any improvements or alterations to the premises without the written consent of LESSOR. Approval by LESSOR of any improvements or installations made by LESSEE, or failure of LESSOR to object to any work done or material used, or the method of construction or installation, shall not be construed as an admission of responsibility by LESSOR or as a waiver of any of LESSEE's obligations under this Lease.

Exhibit A ¶ 7.2.

22. Paragraph 13.3 of the 1996 Lease, which is under a section of the 1996 Lease labeled "Termination, Notices and Removal," provides that at the termination of the 1996 Lease, DNSC shall remove buildings and structures, subject to certain exceptions, and restore the premises to a condition to the satisfaction of Wheeling, specifically mentioning the tamping, compacting, and leveling of the Property:

> Upon termination of this Lease by expiration of term or any other reason, LESSEE shall remove all buildings or structures (except tracks, rail facilities and other designated property of LESSOR), within the time specified in any notice of termination or at the latest within fifteen (15) days after such termination. In effecting such removal, the premises shall be restored by LESSEE to a condition satisfactory to LESSOR, including the removal of all

> structures and facilities [(]whether on the surface or underground) to ground level, and the [filling] of all excavations and holes, which shall be tamped, compacted and graded uniformly. If LESSEE shall fail to make the removal in the manner and time set forth herein, after notice to do so, LESSOR may remove said buildings, structures, and/or facilities and make said restoration, all at the sole risk, cost and expense of LESSEE, and may also dispose of any removed items without necessity to account for the same or to give further notice to LESSEE.

Exhibit A ¶ 13.3.

23. Paragraph 14.2 of the 1996 Lease, which is under a section of the 1996 Lease labeled "Liability and Indemnity," provides that DNSC shall indemnify Wheeling from and against all loss of and damage to any property:

> LESSEE hereby assumes and releases and agrees to protect, save harmless, defend and indemnify LESSOR from and against: (1) all loss of and damage to any property whatsoever, and the loss of or interference with any use or service thereof; . . . and (3) all claims and liability for such loss and damage and cost and expense thereof caused by, arising out of, or resulting in any manner from the condition, existence, use or occupancy of the land and track and adjoining lands of Lessor whether caused by, arising out of or resulting from the fault, failure or sole gross negligence of Lessor or otherwise . . . .

Exhibit A ¶ 14.2.

24. Paragraph 13.1 of the 1996 Lease provides that "[t]his Lease may be terminated by either party at any time upon not less than thirty (30) days' notice in writing . . . ." Exhibit A ¶ 13.1.

25. DNSC renewed the 1996 Lease on multiple occasions, extending the Lease to 2016.

**DNSC Excavates Stockpiled Materials and Creates Ponds on the Property, But Fails to Restore the Property Upon Termination**

26. In or around the early 1980s, DNSC began a twenty-year process of gradually excavating and removing the stockpiled ores.

27. In the process of excavating the stockpiled ores, DNSC also excavated some of the underlying soils, and DNSC removed these soils from the Property along with the ores.

28. The excavation created depressions at the former locations of the ore piles.

29. DNSC did not fill these depressions with soil or any other solid materials.

30. The depressions have filled with water from precipitation and groundwater seeps, and became ponds.

31. By 1993, DNSC's removal of the ores and soil created large ponds on the Property. A true and correct copy of an aerial photograph approximately taken in 1993 depicting the Property and ponds is attached hereto as Exhibit D.

32. Well over ten years later, the Pennsylvania Turnpike Commission (the "PTC") constructed a segment of the Mon-Fayette Expressway in the general area of the Property. This segment of the Mon-Fayette Expressway is situated on a sloped area above the Property.

33. After the construction of the Mon-Fayette Expressway in the relevant area, DNSC continued to excavate ores and soil and, at the present, DNSC's excavation of the ores and soil has resulted in three large ponds that cover a significant area of the Property. A true and correct copy of a recent aerial photograph depicting the Property, the three ponds, the Rail Line, Peters Creek, and adjacent lands is attached hereto as Exhibit E.

34. The first pond is located north of the Rail Line. It is approximately two feet deep at center. The western portion of this pond apparently was graded with imported fill and seeded, and covered with an erosion control blanket to prevent erosion and promote vegetative growth.

35. The second pond, the largest, is located south of the Rail Line. The second pond is estimated to be approximately six feet deep at its deepest point, and has a hard bottom. Water discharges out of the second pond into the third pond.

36. The third pond, the smallest, is located south of the Rail Line on the eastern end of the Property. Like the second pond, the third pond is also estimated to be approximately six feet deep. It has a hard bottom with minimal sediment buildup. Water discharges out of the third pond through a culvert under the Rail Line and onto non-railroad property.

37. The ponds have become a nuisance and/or attractive nuisance. Among other issues, the ponds attract trespassers who fish on the Property.

38. DNSC never requested nor obtained approval, in writing or otherwise, from Wheeling for the creation or maintenance of the ponds.

39. In a letter dated February 25, 2016, DNSC terminated the 1996 Lease effective March 31, 2016 by providing the notice required by Paragraph 13.1 of the 1996 Lease. A true and correct copy of the February 25, 2016 letter from DNSC providing notice of termination is attached hereto as Exhibit F.

40. Despite its termination of the 1996 Lease effective March 31, 2016, and despite receiving demands from Wheeling to comply with its restoration obligations under the 1996 Lease, DNSC has not restored the Property by, *inter alia*, removing the ponds and leveling the Property.

**The Property's Unique Value to Wheeling**

41. In the railroad industry, railroad companies acquire and maintain property adjacent to their rail lines in order to make the property available to railroad customers in order for the customers to utilize the railroad's freight transportation services.

42. Due to the fact that the Rail Line was the last railroad built in the Pittsburgh area at the time of its construction, the most desirable rights of way had been acquired by other railroads. The Rail Line is constructed along the tops of ridges, resulting in few flat parcels of land existing adjacent to the Rail Line. Accordingly, there are very limited areas along the Rail

Line, including the Clairton Branch, on which customers of Wheeling can locate facilities or otherwise conduct business operations.

43. Because the Property is one of a limited number of areas of flat land adjacent to the Clairton Branch, and particularly because the Property contains approximately 76 acres, the Property has a unique value to Wheeling, but such value has been destroyed now that the Property is no longer flat and no longer usable by customers in its current state.

44. Upon information and belief, labor and materials will cost in the area of $2,000,000 to restore the Property to a usable form. This amount does not include other associated potential costs.

## COUNT I
## SPECIFIC PERFORMANCE

45. The averments of the foregoing Paragraphs are incorporated herein by reference as if fully set forth.

46. The 1996 Lease, by its express and implied terms, prohibits DNSC from creating or permitting the maintenance of any nuisance on or about the Property, and DNSC has continued to permit such a nuisance when it terminated the 1996 Lease in 2016.

47. The 1996 Lease, by its express and implied terms, prohibits DNSC from making or permitting to be made any alterations to the Property without Wheeling's written consent. DNSC created and maintained the ponds and DNSC has continued to permit such alterations when it terminated the 1996 Lease in 2016. DNSC has failed to repair such alterations.

48. Wheeling never provided DNSC with written consent to make alterations to the Property to create or maintain the ponds in question at the time of or after the termination of the 1996 Lease.

49. The 1996 Lease, by its express and implied terms, imposes obligations upon DNSC at the termination of the 1996 Lease to restore the Property to Wheeling in an unimpaired condition, with exception made for reasonable wear and tear.

50. Among other obligations imposed by the 1996 Lease, Paragraph 13.3 provides that, upon termination and "[i]n effecting [removal under this Paragraph], the premises shall be restored by [DNSC] to a condition satisfactory to [Wheeling], including the removal of all structures and facilities [(]whether on the surface or underground) to ground level, and the [filling] of all excavations and holes, which shall be tamped, compacted and graded uniformly." Exhibit A ¶ 13.3.

51. DNSC failed and refuses to comply with its obligations under the 1996 Lease related to the condition of the Property, including the obligations related to the condition of the Property upon termination, despite demand from Wheeling.

52. DNSC failed and refuses to comply with its obligations under the 1996 Lease to the extent it created, permitted, and has maintained ponds on the Property when it formally terminated the 1996 Lease.

53. DNSC's failure and refusal to comply with its obligations constitutes a breach of the 1996 Lease.

54. DNSC's failures and refusals to comply with the obligations imposed by the 1996 Lease, including the obligation to restore the Property as required by the 1996 Lease, entitles Wheeling to an order for specific performance.

55. All conditions precedent to the filing of this claim have been performed, fulfilled, or have occurred and/or DNSC has waived or is estopped to raise the non-occurrence of such conditions under the circumstances of the case.

**WHEREFORE**, Wheeling demands judgment be entered in its favor and against DNSC requiring DNSC to comply with the obligations imposed by the 1996 Lease, including the obligation to restore the Property as required by the 1996 Lease; awarding Wheeling equitable compensation for the losses sustained; awarding Wheeling interests and costs; and awarding such other relief as the Court deems just and proper.

## COUNT II
## BREACH OF CONTRACT
## (in the alternative to Specific Performance)

56. The averments of the foregoing Paragraphs are incorporated herein by reference as if fully set forth.

57. The 1996 Lease provides that, "[i]f [DNSC] shall fail to make the removal . . ." as set forth above, Wheeling may "make said restoration, all at the sole risk, cost and expense of [DNSC] . . . ."  Exhibit A ¶ 13.3.

58. Wheeling has suffered damages as a direct and proximate result of DNSC's breach of the 1996 Lease in an amount to be determined at trial in excess of $75,000.

59. All conditions precedent to the filing of this claim have been performed, fulfilled, or have occurred and/or DNSC has waived or is estopped to raise the non-occurrence of such conditions under the circumstances of the case.

**WHEREFORE**, Wheeling demands judgment be entered in its favor and against DNSC in an amount to be determined at trial in excess of $75,000, with interest, costs, and such other relief as the Court deems just and proper.

Dated: June 22, 2017					BUCHANAN INGERSOLL & ROONEY PC

>	By:	/s/Kathleen Jones Goldman
>		Kathleen Jones Goldman (Pa. Id. #90380)
>		kathleen.goldman@bipc.com
>		Bradley J. Kitlowski (Pa. Id. #209385)
>		bradley.kitlowski@bipc.com
>		One Oxford Centre, 20th Floor
>		301 Grant Street
>		Pittsburgh, PA  15219
>		Telephone:  412-562-8800
>		Facsimile:  412-562-1041
>
>	Counsel for Plaintiff, Wheeling & Lake Erie Railway Company